Rolinda KIGHT *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 03-1273                                          189 S.W.3d 498

Court of Appeals of Arkansas
Divisions III and IV
Opinion delivered June 30, 2004

[Rehearing denied August 25, 2004.*]

---

* PITTMAN and GRIFFEN, JJ., would grant rehearing.

232

*Atkinson Law Firm,* by: *Rita B. Atkinson,* for appellant.

*Gray Allen Turner,* for appellee.

*Jenifer Hill Kendrick,* Attorney Ad Litem.

ANDREE LAYTON ROAF, Judge. Appellant Rolinda Kight appeals from the Faulkner County Circuit Court's order terminating her parental rights to her two minor children, A.W. and L.M. For reversal, Kight argues that the trial court erred in terminating her parental rights because she had corrected the reasons causing removal of her children. We agree, and reverse and remand.

DHS became involved with Kight after receiving information from a caller to its hotline that Kight could not supervise A.W., her six-month-old son, because she was getting high on crack and marijuana. This report came in September 2001 and DHS began its investigation, which revealed that Kight tested positive for cocaine and marijuana. A.W. was not removed from Kight's custody at that time; instead, DHS developed a "safety plan" whereby Kight was to undergo drug treatment and submit to random drug tests. Kight was encouraged to participate in parenting classes and instructed to follow a case plan. On May 30, 2002, DHS filed a dependency neglect petition alleging that A.W. was neglected and that it was in his best interest to be removed from the home. The trial court granted a 72-hour hold on A.W. on July

8, 2002, "due to [Kight] testing positive for cocaine and THC," and on July 16, 2002, the court entered an order adjudicating A.W. dependent/neglected and removing him from the home with the goal being reunification with his mother. During the pendency of A.W.'s case, DHS discovered that Kight was pregnant with another child.

Kight was admitted to the Freedom House drug treatment center on July 12, 2002. Kight completed a thirty-day treatment program at the Freedom House and was released on August 12, 2002. The trial court held a review hearing on August 13, 2002. At the hearing, Kight took a drug test, and the result was negative. She was ordered to find and maintain stable employment and housing. Kight subsequently found housing in the Conway Housing Authority, but lost her job due to the dependency/neglected status of A.W. Kight's August 28 and September 17 drug test results were also negative.

On January 2, 2003, Kight gave birth to her daughter L.M. Both Kight and L.M. tested positive for cocaine at that time. L.M. could not be bottle-fed for five days, but other than that proved to be a healthy baby. DHS filed a petition for emergency custody of L.M., and the court entered its emergency order on January 10, 2003. On January 14, 2003, L.M. was adjudicated dependent/neglected, with the goal being reunification with her mother. Kight was ordered to undergo long-term residential drug treatment and submit to random drug tests. The court ordered visitation to take place at the drug treatment facility. Kight entered Chance Sobriety residential drug treatment. CASA recommended a sixty to ninety day treatment, however, Kight underwent treatment for six months.

At the March 18, 2003 review hearing, Ben Perkins testified that since arriving at Chance, Kight had not tested positive for drugs and had maintained stable employment. Kight had been cooperative and as a result received weekend passes. There was one incident where Kight "fraternized" with a male patient, but after being told that the conduct was impermissible, Kight stopped. The court stated that Kight's supervised vitiations with her children could be increased if all parties came to an agreement. The court expressed concern about Kight's plans to marry Raymond Morgan, L.M.'s father, due to his failure to complete drug counseling, his continued drug use, and criminal background. Kight testified that she and Morgan had intended to marry, but that the plans were uncertain due to Morgan's "situation." The court

stated that unless Morgan stopped using drugs he would not have anything to do with the children. DHS prepared its petition to terminate Kight's parental rights on the same day, and it was filed April 24, 2003.

At the July 15, 2003 permanency planning/termination hearing, Perkins again testified. He stated that Kight had successfully completed the six-month program; that he was not recommending any more treatment; and that Kight had been given increased responsibilities due to her success in the program, for example conducting drug screens, sitting at the front desk, and answering the phones. Kight passed all drug tests while at Chance. Perkins was questioned about Kight's continued relationship with Morgan, and he stated that Chance keeps close tabs on the patients and from what he knew Kight was not initiating contact with Morgan. Perkins opined that Kight's contact with Morgan had not affected her responsibilities around the house and also stated that if she used the tools that she had learned in treatment, there was no reason she could not succeed.

The CASA volunteer, Jennifer Jones, testified and recommended termination of Kight's parental rights, although she was only assigned to the case in January and had personally visited Kight one time. Jones did state that Kight interacted well with her children during the one visit she attended. Jones said, "It was very difficult to make my recommendation because I see her making progress, but there's those couple of things, the visitation and the men that concern me." Apparently, Kight missed seven visits with her children; four were her fault and the other three were not. Jones admitted that she only had a few telephone conversations with Kight.

The children's foster mother, Tina Hefter, testified that she had been present during all visitations, but had not observed any improvement. She commented on the fact that during visits with the children, Morgan would sometime show up and Kight would sit on Morgan's lap during the entire visit. Hefter said that during one visit, Morgan told Kight that she would feel better if she smoked some "weed." Hefter testified that she was interested in adopting both children.

Laura Rogers, Kight's DHS case worker, testified that initially Kight was not cooperative, but that after A.W. was taken into custody Kight "did very well," citing Kight's enrollment in the Freedom House drug center and her efforts at obtaining housing. Rogers stated that she was prepared to send A.W. home, but for

Kight's positive drug test at the January hearing. Rogers stated that Kight had stopped smoking around A.W., but thought that she smoked around him later because when she picked A.W. up from visits he smelled of smoke. Rogers admitted that Kight had completed part of the case plan by entering a rehabilitation facility and finding housing, and further admitted that Kight lost her stable housing because she enrolled at Chance and was unable to find work because she was so far along in her pregnancy. Rogers also admitted that A.W. became upset during visits with his mom because he was confused, and although he had some medical problems, they were problems common to all children. Finally, she stated that before A.W. was taken, "he was stable when he was at home with his mother. She was his primary caregiver. She was providing for [A.W.] and she was working." Despite this testimony, Rogers stated that she did not think Kight should have her children back.

Kight testified that she wanted her children back. She stated that she missed the four visits with her children because she overslept, explaining that she got little sleep because in addition to working forty hours per week, she also works at the Chance Sobriety house. She had checked on an apartment at Millwood Landing, an income based apartment complex for permanent housing, but stated that residents must have their children live with them. Kight had been drug free before she enrolled in Chance and has continued to be drug free. Kight denied wanting to maintain a relationship with Morgan, stating that she quit taking her weekend passes because she could not afford a hotel and she did not want to stay at Morgan's house. Kight also denied smoking around A.W. and stated that none of the doctors instructed her to stop smoking. She testified that when A.W. was taken from her she became depressed and the one positive drug test was merely a relapse; that she had been clean for seven months prior to that; that she was depressed without her child; and that she had not intended to get high.

From the bench, the court ruled that Kight's parental rights should be terminated. The trial judge commented that Kight's commitment to breaking her "ties" with her past was shallow. She also stated that but for federal law mandating a permanency plan within one year, "I could give mama another six months or another year." The court opined that it would love to say "let's wait another six months and see if you can break that tie, but I'm just not sure that you understand . . . along with the fact that we've

had this case already in this court for 18 months on one child and a year on the other, I cannot take that chance." The judge continued,

> I don't want to close until I say this: Ma'am, what you have done about going into rehab and staying there for six months has probably saved your life. I cannot commend you enough for that. That decision that I've made here today is certainly appealable and you talk to Mrs. Atkinson about that and she will explain that to you. The Department has asked for the right to put these children up for adoption and I have given them that. But, if there is an appeal filed, none of that will happen until after the Supreme Court looks at my decision and looks at the whole case and makes a decision.

The written order states that Kight's parental rights to A.W. were terminated due to the fact that the conditions causing removal have not been remedied and A.W. had been out of the home for more than twelve months. As to L.M., the order states that parental rights are being terminated due to little likelihood that reunification will result and that termination is in the child's best interest.

██ This court reviews termination of parental rights cases *de novo. Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W. 3d 286 (2001). Grounds for termination of parental rights must be proven by clear and convincing evidence. *M.T. v. Arkansas Dep't of Human Servs.*, 58 Ark. App. 302, 305, 952 S.W.2d 177, 179 (1997). When the burden of proving a disputed fact is by "clear and convincing evidence," the question on appeal is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well being of the child. *M.T., supra.*

We are left with a firm conviction that a mistake has been made. Beginning with A.W., the record shows that he was removed from the home due to Kight's drug use. The order adjudicating him dependent/neglected ordered Kight to enter

drug treatment and submit to random drug testing. Kight followed the court's directive and enrolled in the Freedom House. Her drug tests were negative from July 2002 through December 2002, with one positive test in January 2003. Following this test, Kight enrolled in Chance Sobriety. While CASA originally recommended a ninety-day stay, Kight actually completed six months of residential drug counseling. Perkins's testimony regarding Kight's improvement is persuasive, particularly his testimony that she has been drug free throughout the entire program, even though she was given unsupervised weekend passes; that she has been given responsibilities in the house, including overseeing drug testing of other patients; and his belief that Kight will be successful once she reenters society.

■ Likewise, there was testimony that A.W. was stable with his mother and that she was his primary caregiver. In fact, Rogers stated that A.W. was doing well in Kight's care, although she was abusing drugs. Moreover, when Rogers first became involved in this case, she did not remove A.W. from the home, despite knowing that Kight had tested positive for drugs. Thus, the reason for A.W.'s removal was not that Kight was an unfit parent or unable to care for her child, but that she was abusing drugs, which she has corrected. Rogers stated that although uncooperative at first, once A.W. was removed from the home, Kight became serious about getting A.W. back, was doing well, had housing, and that she [Rogers] was prepared to return A.W. to the home. A.W. would have been in his mother's care but for a one-time relapse in January. Notwithstanding this one time relapse, Kight has maintained full time employment while at Chance and has been clean and sober for over six months. This is exactly what DHS asked her to do. DHS has not demonstrated by clear and convincing evidence that terminating Kight's parental rights to A.W. was in his best interest.

■ The fact that a mistake has been made in this case is also evident by the trial court's remarks at the close of the case. First, the trial judge was confused about how long the court had actually been involved in this case. The trial judge mistakenly believed that A.W. had been removed from the home for over eighteen months. The trial court also stated that L.M. had been removed from the home for one year, when she was just removed in January 2003 and was only seven months old at the time of the termination hearing. We cannot ignore the fact that the trial court's decision

was partially motivated by a false belief that A.W. had been removed from the home for almost two years, and that L.M. had been out of the home for one year.

■■ The trial judge was obviously convinced that Kight had made significant progress as indicated by her comments at the conclusion of the trial. It appears, however, that the trial court's decision was made, in part, on a speculative belief that Kight would be involved with another man who abused drugs. This belief is entirely speculative and does not meet that clear and convincing standard of proof. Further, Perkins testified that, even though Morgan had visited Kight at Chance, her involvement with him had not interfered with her responsibilities at the house. Thus, despite Morgan's continued contact with Kight, she was able to remain focused on her goal of sobriety. The evidence also shows that Kight was given weekend passes, some of which were spent at Morgan's home. However, she was able to pass every drug test administered to her upon her return to Chance, including those weekends she spent in Morgan's company. These facts demonstrate that Kight was committed to remaining clean and sober, and that she would be able to maintain her sobriety if her children were returned to her custody.

■ ■ As to L.M., we are likewise left with a firm conviction that a mistake has been made. L.M. was never taken home, and the sole reason for her removal was due to Kight's one time drug relapse. This court does not condone Kight's drug use, especially while pregnant, but we note that L.M. was described as a healthy baby and has suffered no major medical complications. This court has also held that a one-time lapse does not support a termination of parental rights. *See Trout v. Arkansas Dep't of Human Serv.*, 84 Ark. App. 446, 146 S.W.3d 895 (2004), in which this court reversed a termination order, citing numerous improvements made by Trout despite one minor "setback," which occurred during the case. Kight has corrected the problem that caused L.M.'s removal, and the trial court's decision is clearly erroneous. L.M. had only been out of the home for seven months. During those seven months, Kight was working diligently at a residential drug program, at which she proved to be successful. Kight was not given the opportunity to prove that reunification was a worthwhile goal when L.M. was taken from her in January, the same month she entered residential drug rehab, and upon her

release, her parental rights were terminated. The purpose of terminating parental rights is to provide permanency in a minor child's life where return to the home is contrary to the child's health, safety, or well-being and it appears from the evidence that the return to the home cannot be accomplished in a reasonable time, as viewed from the juvenile's perspective. Ark. Code Ann. § 9-27-341 (Supp. 2003); *M.T., supra.* Here, Kight was not given a reasonable time to demonstrate that L.M. could be safely returned to her home.

■ Accordingly, we hold that the trial court's decision terminating Rolinda Kight's parental rights regarding A.W. and L.M. is clearly erroneous. We reverse and remand this case with instructions to the trial court to continue reunification services.

Reversed and Remanded.

HART, NEAL, and BAKER, JJ., agree.

GRIFFEN and PITTMAN, JJ., dissent.

WENDELL L. GRIFFEN, Judge, dissenting. I would affirm the circuit court's termination of appellant's parental rights with regard to both of her children. The majority's rationale is that the circuit court erred in terminating appellant's parental rights because she had corrected the condition that caused the removal of her children. It is true that the children were initially removed from appellant's home due to her drug usage. However, in determining that it is in the children's best interests to be returned to appellant's care because she is sober, the majority adopts a narrow view of the best interests of the children. The majority ignores the trial court's additional finding that subsequent events demonstrated that the return of the children to appellant was contrary to their health and safety. That is, the circuit court recognized that factors in addition to appellant's newly-found sobriety were relevant in determining the best interests of her children.

The statute governing the termination of parental rights, Arkansas Code Annotated § 9-27-341 (Supp. 2003), provides in relevant part:

> [b](3) An order forever terminating parental rights shall be based upon a finding by clear and convincing evidence:
>
> (A) That it is in the best interest of the juvenile, including consideration of the following factors:

(i) The likelihood that the juvenile will be adopted if the termination petition is granted; and

(ii) The potential harm, specifically addressing the effect on the health and safety of the child, caused by continuing contact with the parent, parents, or putative parent or parents; and

(B) Of one (1) or more of the following grounds:

(i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

. . .

(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

At the conclusion of the termination hearing, the court orally stated its justification for termination, *inter alia*, as follows:

Your commitment to breaking your ties with your past is very shallow to the point that I am afraid for these children. I would love to be able to say let's wait another six months and see if you can break that tie, but I'm just not sure that you understand. And I'm not sure that there won't be another man that will come along with some other enticement and you won't make the bad choice again. Because of that doubt along with the fact that we've had this case already in this court for eighteen months on one child and a year on the other,[1] I cannot take that chance. Termination of parental rights will be granted.

---

[1] The court was mistaken as to the length of time that L.M.'s case had been open because she was only seven months old at the time of the termination hearing.

The court subsequently entered separate termination orders for each child. With regard to A.W., the court found that it would be contrary to his best interests to return him to appellant's custody, that he had been adjudicated to be dependent-neglected and had been out of the home for twelve months, and that the conditions that caused his removal had not been remedied by his mother. With regard to L.M., the court found that it would be contrary to her best interest to be returned to appellant's custody, and that there was little likelihood that services to the family would result in reunification.

I do not believe the circuit court's findings were clearly erroneous. First, even though the circuit judge was mistaken as to the amount of time the children had been out of the home, this does not warrant reversal, because the judge still acted properly under § 9-27-341 in ordering termination. At the time of the termination hearing, A.W. had been out of appellant's home for more than twelve months, as required by § 9-27-341(b)(3)(B)(i)(a). Because of the length of time that A.W. had been out of the home, the court was required by Arkansas Code Annotated § 9-27-338 (Supp. 2003) to determine a permanency goal that was in A.W.'s best interests. While the court obviously could have taken more time with L.M., whose case had only been open for seven months, it was not required to do so because its determination that termination was proper with respect to appellee's rights to L.M. was based on § 9-27-341(b)(3)(A) and § 9-27-341(b)(B)(vii)(a), which do not mandate that the child be out of the home for a specified period of time.

Second, I do not agree with the majority's conclusion that appellant had worked "diligently" at the drug rehabilitation program for seven months. The case was opened in September 2001. Appellant had just graduated from her six-month program on the same day that the termination hearing was held in July 2003. It is true that appellant passed all of her drug tests while in treatment. However, the greater weight of the evidence was consistent that, until March 2003, only three months prior to the termination hearing, appellant did not take her drug problem seriously.

For example, she lied to the court about her drug abuse. In the May 2002 hearing, appellant testified that she had used drugs only one time, when appellee first opened its case on her. However, immediately following the same hearing, appellant tested positive for marijuana. Further, she continued to use drugs even after A.W. was removed from her custody. Prior to L.M.'s birth,

appellant testified that she would never use drugs while she was pregnant. However, she used cocaine when she was pregnant with L.M., which required L.M. to remain hospitalized for an extended stay after she was born. Moreover, one week after L.M. was born and removed from appellant's custody, appellant again tested positive for cocaine.

In addition, as late as March 17, 2003, only three months prior to the termination hearing, appellant told her DHS caseworker that she did not want to complete a six-month program because she and Raymond Morgan, L.M.'s father, wanted to be married and he could not support two households while she was in rehabilitation. According to appellant, Morgan was a drug user whom she met shortly after he was released from jail for selling crack. After her first attempt at drug rehabilitation, she lived with Morgan. She stated she was engaged to Morgan before L.M. was conceived.

At the review hearing held on March 18, 2003, appellant testified that Morgan was still using drugs and had caused her to lose her apartment. She stated that Morgan was "bad" for her and that she would no longer see him. Yet, later in the same week, she used her weekend pass to visit him. Appellant's CASA caseworker testified that on July 2, 2003, less than two weeks before the termination hearing, appellant stated that she was going to wait until after the termination hearing to decide whether to marry Morgan. The foster mother testified that nine days before the termination hearing, and in the presence of the children, Morgan encouraged appellant to "go smoke some weed." At the termination hearing, Morgan was described by his parole officer as a parole absconder with an active felony warrant.

Ben Perkins, appellant's drug counselor, testified that he had confidence appellant would stay clean and sober. However, he also opined that appellant's desire to continue her relationship with Morgan showed poor judgment. Perkins further stated that if appellant maintained a relationship with Morgan, she was in jeopardy of backsliding into drug use, and that her possibility of failure was high if she continued her relationship with Morgan.

Thus, appellant's casual attitude about sobriety, her association with Morgan during her recovery period, and her insistence on determining whether to marry him pending the outcome of the termination hearing, demonstrates that her efforts to engage in behavior that will support her sobriety has been anything but

diligent. While the majority is to be commended for its hope that appellant will remain drug-free, I join the circuit judge in concluding that there is no reason to subject her children to the vagaries of her life with a known drug-dealer. The trial court was well within its authority to consider those factors in deciding the best interests of the children.

Third, while appellant's relationship with Morgan may not have interfered with her responsibilities at Chance Sobriety, more importantly, this relationship did interfere with her relationship with her children. Appellant either never truly understood or never cared about the effect that her continued relationship with Morgan had on her attempts to remain sober, which, in turn, affected her relationship with her children. During her six-month stay at Chance Sobriety, appellant shared her one-hour weekly visits with her children and Morgan. According to the foster mother, during some of the visits appellant sat on Morgan's lap and seemed more interested in Morgan than in bonding with her children.

In short, appellant did not make it a priority to establish a relationship with her children. During appellant's six-month stay at Chance Sobriety, she missed several visits with her children. She missed three visitations because her privileges had been suspended, because she broke the drug treatment facility's rules, one of which was a rule forbidding fraternization with a male patient. She also missed four visitations due to other factors, such as oversleeping. Thus, appellant missed almost two months' visitation with her children during a six-month stay — nearly one-third of her allowed visitation. The CASA volunteer concluded that appellant's behavior demonstrated a lack of conviction for the goal of reuniting with her children.

Fourth, it is obvious that the circuit court assessed appellant's lack of credibility, based on her previous conduct in lying to the court regarding her drug usage and her relationship with Morgan, when judging her statements that she intended to remain drug-free, that she understood why she needed drug treatment, and that she would not continue her relationship with Morgan. Contrary to the majority's assertion, it did not require speculation for the court to determine that appellant intended to continue a relationship with Morgan. The trial court did not conjure or surmise that appellant was considering marriage to him less than two weeks prior to the termination hearing. Appellant testified to that effect. I see no reason why the trial court should not have considered the

effect of that intention when it determined whether denying the petition to terminate parental rights was in the best interest of two small children.

Finally, while appellant is to be commended for remaining sober for six months, this "eleventh-hour" effort, alone, is not a sufficient ground to preclude termination. Arkansas Code Annotated section 9-27-338(a)(4)(E)(iii) (Supp. 2003) provides that a parent's cooperation in following the court's order in the months or weeks immediately preceding the permanency hearing are insufficient grounds for retaining reunification as the permanency plan. The majority is mistaken when it asserts that appellant had been sober for over six months. Appellant completed the six-month rehabilitation program on the day of the termination hearing. She had only been sober for six months as of the day of the hearing. Further, she only began demonstrating sincerity about remaining sober during the three months immediately before the termination hearing. Except for weekend passes, she had resided at the rehabilitation facility. Thus, the record does not demonstrate whether she will remain sober in the real world. In any event, despite appellant's recent sobriety, the circuit court found ample reasons demonstrating why it was not in the children's best interests to be returned to her care.

In the final analysis, we make the grave decision to terminate parental rights because our legislature intends that judges make the "best-interest" determination based on what the record shows is likely to happen to helpless children, not what we hope will happen to parents. I hope appellant remains sober. I hope she either finds a drug-free companion or that Raymond Morgan drastically improves his behavior. However, like the trial court, I am more concerned about the harm likely to befall two dependent children from appellant's misjudgments than I am convinced the trial court was wrong or am concerned about the implications if the trial court was wrong. If the trial court was wrong about appellant (a view I do not endorse), the children are likely to be safe, nevertheless. If the majority is wrong, the children are likely to be endangered in ways that cannot be remedied by apologies.

I respectfully dissent, and I am authorized to state that Judge Pittman joins this opinion.