ROBERT J. GLADWIN, Judge
In this appeal of the termination of his parental rights, Duane Ewasiuk argues that the trial court relied on insufficient evidence. We affirm.
I. Facts and Procedural History
In early September 2015, the Arkansas Department of Human Services (DHS) took custody of J.E. (born December 4, 2010) and K.E. (born June 5, 2014) because their mother, Elizabeth Ewasiuk, had left their nine-year-old half brother in a hotel room without food or supervision, and Elizabeth could not be found. J.E. and K.E. had been left with a friend during that time. Elizabeth admitted using methamphetamine but refused to be drug tested, and her parental rights were eventually terminated.[1] Duane's drug screen was negative. Duane and Elizabeth were separated when the children were taken into DHS custody, and Duane was living at a separate residence and working out of town Monday through Friday.
Based on these facts, DHS filed a petition for emergency custody alleging that the children were dependent-neglected due to neglect or parental unfitness.[2] An ex parte order granting custody to DHS was filed, and a probable-cause hearing was set in the Johnson County Circuit Court. The resulting probable-cause order continued custody with DHS; awarded Duane supervised visitation contingent on drug screening; and ordered Duane to obtain and maintain stable housing and employment.
The children were adjudicated dependent-neglected on November 3, 2015. The *320 trial court found that the children were at substantial risk of serious harm based on neglect because of inadequate supervision due to their mother's drug use. The children remained in DHS custody for their protection, and the goal of the case was reunification. The orders pertaining to Duane remained unchanged.
The case was reviewed in January 2016, and it was found to be in the children's best interest to remain in DHS custody, and the goal of the case remained reunification. The trial court found that DHS had made reasonable efforts to provide services to achieve the goal. There were no specific findings related to Duane, and his orders remained the same with the added requirement that he submit to a drug-and-alcohol assessment and complete all its recommendations. In its review order from the April 19, 2016 hearing, no findings were made related to Duane, but the trial court ordered that he submit to, and successfully complete, outpatient drug treatment.
The permanency-planning order was filed on July 27, 2016, and the goal of the case was changed to adoption. No findings were listed regarding either parents' compliance with the case plan. Duane's orders remained unchanged.
DHS filed a termination-of-parental-rights (TPR) petition on September 6, 2016, and alleged that, subsequent to the filing of the original petition, other factors arose that demonstrated that returning the children to their parents' custody would be contrary to their health and safety and that the parents had manifested the incapacity or indifference to remedy the subsequent issues. See Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) (Repl. 2015). DHS alleged that Duane did not have stable housing; had not submitted to any random drug screens; had not attended outpatient drug treatment as ordered; had six positive drug screens during the case; had been jailed during the case for failure to pay fines; and had not visited the children on a regular basis. DHS claimed that it was in the children's best interest that its petition be granted.
After a hearing on November 15, 2016, the trial court filed an order denying DHS's petition for termination of Duane's parental rights. The court specifically found:
[DHS] has not proven by clear and convincing evidence that termination of the father's parental rights is in the best interests of the children. The children have a significant bond with the father. He is visiting regularly and the visits are going well. The father needs to complete only one outpatient drug abuse treatment session in order to complete the treatment. He last tested positive during the summer. While he did drink beer and had to restart the treatment in August, he is now nearing completion of the treatment without further issues. He is presently employed and has housing available.
The Court is aware that most of the father's progress occurred after the permanency planning hearing and that the father remains legally married (albeit separated) to the mother whose rights have been terminated. However, the evidence presented regarding the bond between the father and the children, his maintaining this bond by visiting regularly, along with his impending completion of outpatient drug treatment leads the Court to the conclusion that clear and convincing evidence has not been presented that termination is in the best interests of the children.
It remains in the best interests of the children to remain in the custody of [DHS] and that the goal be returned to reunification with the father.
*321 A permanency-planning order followed a February 2017 hearing, and the goal of reunification was ordered because Duane had been complying with the case plan and orders and had made significant measurable progress toward reunification. Duane was subject to the court's original orders that he submit to random drug screens and obtain and maintain stable housing and employment. In a second permanency-planning order from a May 2, 2017 hearing, the goal of the case was again changed to adoption. There were no specific findings regarding Duane's compliance.
DHS filed a petition for TPR on May 19, 2017, alleging that Duane had tested positive for methamphetamine, amphetamines, and THC on April 14, 2017, and this was confirmed by a lab. After confirmation, Duane admitted smoking THC but continued to deny methamphetamine use. DHS alleged that Duane was unemployed at the time of the permanency-planning hearing, had not had stable housing during the case, had not visited the children on a consistent basis, and continued to have contact with Elizabeth. DHS alleged that these facts supported the "other factors" ground for termination.
At the TPR hearing held on June 20, 2017, DHS caseworker Mahogany Smith testified that DHS had provided services to Duane in the form of referrals for a drug-and-alcohol assessment, supervised visits, random drug screens, transportation, referrals for outpatient treatment, and home visits. She said that Duane had testified at the previous TPR hearing in November 2016 that he was about to complete outpatient treatment the next day. However, she said that he did not complete it until December 20, 2016. Since that time, DHS had given Duane drug screens, and he tested positive on April 14, 2017, for THC, methamphetamine, and amphetamines. She said that he denied the methamphetamine use, DHS "sent that sample off," and the test was returned positive for all three drugs. She said that Duane told her he had taken a "nitro pill" that a friend had given him, and he had not known that it would cause him to test positive. He also admitted to her that he took "one puff of weed."
Smith said that DHS was concerned because Duane admitted having contact with Elizabeth at the May permanency-planning hearing, and the concern was based on the facts that Elizabeth had her parental rights terminated, Duane was still in contact with her, he was not legally divorced from her, and the divorce had been pending since before the first TPR hearing. She said that Duane had an appropriate home in Lamar, but at the last TPR hearing, he was living in Cabot. She also said that Duane's employment was not stable and that he had been working for Townsell Construction, which required him to travel extensively when the case began. He was told that to be "looked at as a placement for these kids to go home to, he needed to get a local job." She said that he got a job, then quit that job to work at the nuclear plant. When that plan failed, he tried to work for Hanes. When that plan failed, he told her he was going to start catching chickens, but she had not verified that job. She said that she had done a home visit on Duane two weeks after the last hearing, and a woman there told her that Duane had gone to work for Townsell Construction again; however, Duane told her that he had worked there for one week. She said that Duane's work situation was unstable and had been throughout the case. She said that the goal for the children was adoption; that it was very likely that they would be adopted; DHS has had children adopted in similar situations; and that DHS felt that it was in the children's best interest to terminate Duane's parental rights.
*322 On cross-examination, Smith said that she had been unable to randomly drug screen Duane and that he was screened before every visitation. She said that Duane had been at his present home since January 2017, and it was appropriate. She agreed that Duane had been employed throughout most of the case and that one of the times he had changed employment was at the direction of DHS. She said that Duane was participating in individual therapy with J.E. and that visitation with the children had gone well. She said that before Elizabeth's rights were terminated, Duane had tested positive for drugs and that those positive screens occurred around the time Duane and Elizabeth had been together. She said that this was part of DHS's concern about Duane's having contact with Elizabeth. She said that Elizabeth had not remedied her drug use since her rights had been terminated, that Elizabeth had been arrested on drug charges in May 2017, and Duane tested positive in April 2017, around the time he admitted being around Elizabeth.
Kelsey Lewis, a licensed certified social worker, testified that she had been J.E.'s therapist since October 2016. She said that J.E. has severe behavioral problems, including anger outbursts, running off, cussing, and tantrums. She said that J.E. had made progress and was showing less defiance. Lewis said that she had been in a "state of flux" with the case because, even though the hearing was for TPR, Duane had recently been involved with J.E.'s counseling. She said Duane began therapy with J.E. in April 2017 and he was cooperative, open, and pleasant. She said that she had discussed with Duane
whether or not it would [be] detrimental to J.E. if [Elizabeth] was reintroduced into the picture and back into her life for any length of time. In that conversation, I had talked about how since she had gone through termination and we had discussed it and we had tried to resolve it and make her okay with it, reintroducing mother to that situation would be very confusing for J.E. and would be difficult for her to understand.... if [Elizabeth is] suddenly reintroduced back into her life, she's not going to have coping skills, she's not going to have been able to get her feelings out there and processed correctly.
The following colloquy occurred:
ATTORNEY AD LITEM : How did Mr. Ewasiuk relate to you that Ms. Ewasiuk was? Did he tend to idealize her? Did he tend to make her out to be more favorable? What was that scenario?
LEWIS : He spoke very highly of J.E.'s mother. Did seem to idolize her a bit. Seemed still smitten with her. Described her as a bit manipulative and able to have a pattern of convincing him to get back to her until the first disagreement and then she would go back to her drug lifestyle and other men.... So, basically, she controlled the extent of their relationship; fair enough. Yes, that he had little assertiveness with her.
Lewis also testified that she thought Duane had minimized the reasons that the children were placed in DHS custody. She thought Duane felt that the children were "safe where they were. That they weren't in any harm." She said the bond between Duane and J.E. had been compromised over the past twenty months that J.E. had been in foster care, and she did not know how strong it had been before or if they had a bond before. She said that Duane had been very attentive in therapy and was engaged and responsive when discussing issues. She said that he was appropriate and likeable. She had concerns with Duane's impulsivity and judgment at times, giving as examples his failed drug *323 test, speeding, and cliff diving. She said that Duane had been to the therapy appointments on Fridays since April, and the appointments were in Harrison, which was two hours travel time for him. She said that she thought Duane was still in love with Elizabeth.
Duane testified that he was living in Lamar and had been since January. He said that he was working with Mark Mackey in construction and had been, on and off, since December. He then said that he was working for Townsell Construction most recently and that if he was available to work out of town, he could go to work immediately. He said he was aware of one time that Smith had tried to give him a drug screen and he was not home, and he claimed that Smith had not tried to contact him for that purpose. He said that he had been visiting his children regularly and that he had attended six to eight therapy sessions with J.E.
Duane said that he had filed for divorce from Elizabeth, but it had not been finalized. He denied having been in contact with Elizabeth, explaining that she had blocked him from Facebook because he "went off on her." He said he had no way of reaching her and that he heard she was not in town. He explained that the last time he saw her was at her brother's house. He said that he drove up, and she was outside. She offered to allow him to talk to her son on the phone, and he did, even though he knew he should not. He said that he did not "talk the rest of the day, and [he] left shortly after." He said that he heard she was with someone else. He denied having any feelings for Elizabeth and stated that he had explained to the therapist how he felt about her when they met and how she was before the drugs. He said he understood that she did not need to be around the children and that he would not allow it if he obtained custody.
Duane denied needing additional drug treatment but stated that he would be willing to do it. He admitted that he had failed the drug screen in April and said that he had smoked marijuana and taken a pill without knowing what it was. He denied any drug use since that time. He said that his job situation came down to his citizenship information, he is Canadian, and his Social Security card and permanent-resident card had been stolen from his wallet eight years ago. He added that he thought he could get a job at the Walmart distribution center. He said that his mother could help him with childcare and that he would be willing to continue the drug screens.
Duane's sister-in-law, Alishia Evans, testified that she is married to Elizabeth's brother and that she and her husband had known Duane before Elizabeth had. She said she does not have a relationship with Elizabeth but that Elizabeth had been to her house the day before. She stated that she and her husband saw Duane regularly, no less than three times a week. She was not aware of Duane's maintaining a relationship with Elizabeth and had not seen him have any contact with her. She said it had been over a year since Duane and Elizabeth were together as a couple and that Duane did not want anything to do with Elizabeth.
The trial court ruled that TPR would be granted, relying heavily on the therapist's unbiased and credible opinion. The trial court stated that the first TPR petition was denied as to Duane; however, seven months later at this hearing, Duane remained married to Elizabeth, whose rights had been terminated, and continued to have contact with her family. The trial court stated,
*324 The impression I get from watching and observing the witnesses, including the father, testify, is that he frankly adores the mother. He holds her in a high regard. I think it's my belief, my impression based on watching him, listening to him, that he still holds out hope that the mother will eventually be able to rehab her drug life and return to the person she was before and that he can then continue that relationship. That's the impression. That's the impression I'm getting from watching and observing the father's testimony and hearing what he had to say. I think he still holds out hope that he can reignite that relationship with the mother. He shows up at the brother's place, "Oh, low and behold, there's mom. Well, how about that. What a coincidence." I think he still wants to have contact with her. That's my opinion. I think he's holding out hope. I think he still carries a torch for mom. And with him having and maintaining this relationship with her brother, there's a substantial chance that he will have contact with the mother and that if we return this child to him, the child will then have contact with this mother, whom her counselor has said this would be very detrimental to the child to have such contact. I think the counselor, herself, indicated that she thought dad was, quote smitten, end quote. And that he still holds a torch, so to speak, for mom. I found the counselor's testimony to be very creditable, very persuasive. Like I said, she has no reason to say other than what she honestly believes. So that is a big concern for the Court.
The trial court also noted its concern that Duane tested positive for THC, methamphetamine, and amphetamines in April 2017.
The TPR order filed June 27, 2017, states that the trial court found that TPR was in the children's best interest, that they would likely be adopted, and that there was potential harm to their health and safety if returned to Duane. The trial court found that "other factors" arose subsequent to the original petition, which included that Duane tested positive for illegal drugs on April 14, 2017, he continued to have contact with Elizabeth, whose parental rights had been terminated, and that reintroduction of Elizabeth into the children's lives would be detrimental to the children. See Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) .
In Duane's appeal of the TPR order, he challenges the sufficiency of the evidence supporting the trial court's conclusions that he was still in love, and desired to be with, the children's mother and that he "continued" to test positive for drugs when he had a single positive drug screen.
II. Standard of Review
We review TPR cases de novo. Parnell v. Ark. Dep't of Human Servs. , 2017 Ark. App. 688, --- S.W.3d ----. Grounds for TPR must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. Id. The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In resolving the clearly erroneous question, we give due regard to the opportunity of the trial court to judge the credibility of witnesses. Id. On appellate review, this court gives a high degree of deference to the trial court, which is in a far superior position to observe the parties *325 before it. Id. TPR is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. Id.
Pursuant to Ark. Code Ann. § 9-27-341(b)(3), an order forever terminating parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the juvenile, including consideration of the likelihood that the juvenile will be adopted if the termination petition is granted and the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). The order must also find by clear and convincing evidence one or more grounds. Ark. Code Ann. § 9-27-341(b)(3)(B).
The purpose of the TPR statute, Ark. Code Ann. § 9-27-341(a)(3), is to provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the juvenile's perspective. Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. Camarillo-Cox v. Ark. Dep't of Human Servs. , 360 Ark. 340, 201 S.W.3d 391 (2005) ; Cole v. Ark. Dep't of Human Servs. , 2012 Ark. App. 203, 394 S.W.3d 318 ; Tucker v. Ark. Dep't of Human Servs. , 2011 Ark. App. 430, 389 S.W.3d 1. A parent's past behavior is often a good indicator of future behavior. Stephens v. Ark. Dep't of Human Servs. , 2013 Ark. App. 249, 427 S.W.3d 160.
III. Sufficiency of the Evidence
Duane does not challenge the trial court's finding that his children are likely to be adopted; however, he denies that he posed a potential risk to their health and safety or that there were any issues that arose subsequent to the children's removal that he failed to remedy so insufficiently that it was contrary to the children's health, safety and welfare to return to his custody. He argues that there is no evidence of record to support the trial court's belief that he continues to hold out hope that Elizabeth will get clean from drugs, that he can continue a romantic relationship with her, and that this continued contact would be detrimental to J.E.
Duane contends that because the orders leading to the TPR petition are devoid of findings regarding him, the testimony at the TPR hearing provides the only source of evidence on this issue. He argues that Lewis speculated that he was vulnerable to Elizabeth's influence because he might be "impulsive" and "immature." She based this on his having received a speeding ticket on his way to a therapy session with her and his ankle injury that Lewis believed was a result of his "cliff diving."[3] He contends that Lewis acknowledged that his response was appropriate when she discussed with him the harm it would cause J.E. to be reintroduced to Elizabeth, and she acknowledged that Duane had appropriate judgment regarding J.E. during therapy.
Duane points to his own testimony clarifying the contact he had with Elizabeth and his thought about J.E. having contact with her and contends that his testimony was unchallenged and bolstered by his sister-in-law's *326 testimony. He describes the trial court's statement that the divorce had not been finalized, which indicated Duane's lack of urgency, as unfair. He claims that his testimony regarding his contact with Elizabeth proved that he had no relationship with her and that he could not assist with service of the divorce petition because he did not know where she lived. Thus, he argues that there was no evidence that he still loved Elizabeth.
Duane argues that while the trial court might not have believed him, even credibility determinations must relate to testimony or evidence regarding material facts. Guthrey v. Ark. Dep't of Human Servs. , 2017 Ark. App. 19, 510 S.W.3d 793 (reversing termination order when circuit court made findings that were not supported by the record or were based on speculation). Duane argues that he denied having any relationship with Elizabeth and that there was zero evidence to the contrary. He claims that the trial court substituted its credibility determination for substantive evidence, which was reversible error.
Duane also argues that the trial court did not cite any facts to support its finding that he continued to use drugs even after completion of drug treatment. He contends that the record does not demonstrate that he used drugs frequently or at all, except in the order denying DHS's first motion to terminate his parental rights when the court noted that he tested positive in the summer of 2016. He acknowledges that, after completing drug treatment, he had a single positive test in April 2017. He contends that the trial court's orders do not include findings regarding drug usage and that the caseworker's testimony that he "started" testing positive was inaccurate based on one positive drug screen in April 2017. He argues that his single positive drug screen was isolated, idiosyncratic, and not "continued." He cites Kight v. Arkansas Department of Human Services , 87 Ark. App. 230, 189 S.W.3d 498 (2004), in which this court reversed a TPR order when the evidence was that, notwithstanding a one-time relapse, Kight remained clean and sober for over six months, had maintained full-time employment, and had completed everything that was required of her. Duane further contends that the law does not require "flawless compliance" with court orders or "perfect parent[ing]." Rhine v. Ark. Dep't of Human Servs. , 2011 Ark. App. 649, 386 S.W.3d 577 ; see also Cranford v. Ark. Dep't of Human Servs. , 2011 Ark. App. 211, 378 S.W.3d 851.
Duane urges this court to require more from DHS in meeting its burden of proof. He contends that a caseworker's mischaracterizations and failure to produce the proof of her attempts to randomly drug screen him cannot be the basis for termination. See Jefferson v. Ark. Dep't of Human Servs. , 356 Ark. 647, 158 S.W.3d 129 (2004) (TPR is an extreme remedy and in derogation of the natural rights of the parents).
DHS contends that Duane's arguments do not warrant reversal of the trial court's order and that clear and convincing evidence supports the "other factors" ground. We agree. The "other factors or issues" ground cited by DHS is found at Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)(a ) :
That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances *327 that prevent the placement of the juvenile in the custody of the parent.
Duane's failure to remedy the subsequent factors occurred despite appropriate family services being offered. Further, the evidence supported that Duane lacked urgency to become a parent capable of providing a safe environment for his children's return, when twenty-one months into the case, he had allowed his employment situation to deteriorate to unstable job hopping, he had continued contact with his wife whose parental rights had been terminated, and he had used drugs after completing outpatient treatment. See Del Grosso v. Ark. Dep't of Human Servs. , 2017 Ark. App. 305, 521 S.W.3d 519 (appellant's lack of urgency coupled with other findings supported the trial court's finding that appropriate services had been provided); Howell v. Ark. Dep't of Human Servs. , 2009 Ark. App. 138, at 8, 2009 WL 476076"other factors" ground was relied on by trial court and affirmed, and our court stated that, "[a] stable home is one of a child's most basic needs").
DHS asserts that Duane's employment situation was worse at the termination hearing than it was at the beginning of the case. DHS argues that Duane sat on the problem of his immigration paperwork for years, showing no urgency in finding a remedy. Further, DHS claims that the evidence supported that Duane remained enamored with Elizabeth. The caseworker's testimony indicated this; the parties remained married at the time of the TPR hearing; and there was a link between Duane's contact with Elizabeth and his drug usage. The caseworker testified:
Last year before a termination on Elizabeth, there had been some positive drug screens from [Duane]. Those positive drug screens occurred around the time they were together. That's part of [DHS's] concern with [Duane] having contact with Elizabeth. At the time that the court terminated on [Elizabeth], she had not remedied her drug issue. She was recently arrested on drug charges. That was May of 2017. And [Duane's] positive drug screen in April, was around the time he admitted to being around [Elizabeth].
Lewis testified that continued contact with Elizabeth could be detrimental to J.E. Further, she stated that Duane seemed "smitten" with Elizabeth and had described her as manipulative and able to convince him to get back with her. Elizabeth's sister-in-law testified that she and her husband, Elizabeth's brother, were good friends with Duane and regularly saw him. Duane testified that he had encountered Elizabeth at her brother's house, and although he could have turned around, he chose to drive up and interact with her. In light of this evidence, the trial court did not clearly err in concluding that Duane's ongoing relationship with Elizabeth's brother increased the chances of ongoing contact with Elizabeth.
DHS also contends that the testimony indicated that Duane had not remedied his drug problem. We agree. The caseworker testified that Duane did not start the outpatient treatment until it became clear that Elizabeth was not going to be able to comply with the case plan. Duane did not complete outpatient treatment until after the termination hearing held October 2016, even though it had been ordered in January 2016. Duane tested positive for THC, methamphetamine, and amphetamines in April 2017, almost twenty months into the case. The therapist indicated that Duane had poor judgment based in part, on the failed drug test, and Duane testified that he smoked marijuana in April 2017 and took a pill, even though he did not know what it was. DHS claims that, unlike Guthrey , supra , the trial court relied on the *328 testimony of multiple individuals and did not hinge its determination solely on a finding that Duane was not credible. And, unlike Kight , supra , Duane was not complying with the case plan and more than twenty-one months had transpired in the case, whereas in Kight, only seven months had elapsed.
Duane asks this court to reweigh the evidence, which is improper. Posey v. Ark. Dep't of Human Servs. , 370 Ark. 500, 262 S.W.3d 159 (2007). Appellate courts defer to the trial court's credibility determinations, and in matters involving young children's welfare, give great weight to their observations. Osborne v. Ark. Dep't of Human Servs. , 98 Ark. App. 129, 252 S.W.3d 138 (2007). Further, the trial court was not required to believe Duane's testimony that he did not continue to use drugs and that he and Elizabeth had only minimal contact. See Tankersley v. Ark. Dep't of Human Servs. , 2012 Ark. App. 109, 389 S.W.3d 96 (holding that the trial court was not required to believe appellant's self-serving testimony).
Affirmed.
Whiteaker and Brown, JJ., agree.

Elizabeth is not an appellant in this case.

The petition included Elizabeth's nine-year-old son, who is not a subject of this appeal.

Duane testified at the TPR hearing that he injured his ankle in a three-wheeler accident.