ROBERT J. GLADWIN, Judge
Veronica Rivera appeals the Poinsett County Circuit Court's termination of her parental rights to G.H., born May 30, 2015, arguing that the circuit court's findings were clearly erroneous. We affirm.
I. Facts
The Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect claiming that on June 20, 2016, it took a seventy-two-hour hold on G.H. when Rivera was arrested for allegedly stabbing her stepfather.[1] DHS claimed that Rivera had left G.H. in the custody of her mother. When Rivera arrived with G.H.'s father, Tommy Henton, to retrieve the child, both Rivera and Henton were drunk, and Rivera's mother was not home. Rivera's stepfather tried to prevent them from taking G.H., and a fight ensued. Rivera's stepfather was stabbed with a kitchen knife, and Rivera and Henton were arrested. Later, Rivera's mother tested positive for methamphetamine and MDMA. A June 28, 2016 ex parte order found probable cause to believe that G.H. was dependent-neglected (DN) and that it was in the child's best interest to remain in DHS custody.
The probable-cause order reflects that Rivera was incarcerated at the time of the hearing and did not attend. The court ordered that G.H. remain in DHS custody, and the goal of the case was reunification with Rivera. The parents were ordered to complete a myriad of tasks, including that they obey all court orders, remain drug free and submit to random drug screens, *878 submit to a drug-and-alcohol intake at an inpatient treatment facility, obtain and maintain stable housing and employment, and resolve all outstanding criminal matters.
Rivera was present for the hearing on July 20, 2016, that resulted in an adjudication order finding the child DN, having been subjected to neglect and parental unfitness based on Rivera's extreme intoxication and first-degree-battery and aggravated-assault charges. The goal remained reunification with a concurrent plan for relative placement, permanency, and adoption.
A review order from the October 25, 2016 hearing was based on the parties' stipulation. The court found that it was in G.H.'s best interest to remain in DHS custody. The goal continued to be reunification, and the court found that DHS had made reasonable efforts to provide family services. The court found that Rivera had not cooperated with DHS nor complied with the case plan and all court orders to obtain and maintain stable employment and to successfully complete inpatient treatment.
At the review hearing on April 19, 2017, the circuit court found:
At the last court hearing that was continued, Ms. Rivera reported that she is working. However, at the hearing the mother tested positive for illegal substances. In addition, Ms. Rivera was admitted into inpatient rehab on August 31, 2016, however, the mother was discharged on September 14, 2016, for not following the rules of the program. The mother has completed parenting classes. The mother is currently receiving outpatient services; however, it has been reported that she was very rude at the last group session on March 20, 2017. The mother missed her individual therapy appointment on March 20, 2017. The court finds that Ms. Rivera is partially compliant with the case plan and orders of the court due to completing parenting classes and stating under oath that she is employed.
In a handwritten addition, the court ordered that Rivera provide a copy of her lease and proof of employment to DHS and that DHS aid Rivera in obtaining a valid driver's license and valid car registration. DHS was also ordered to establish visitation for Rivera.[2]
The September 22, 2017 permanency-planning order set a permanent goal of adoption and allowed DHS to file a petition for termination of parental rights. The court found that DHS had made reasonable efforts to finalize a permanency plan. The court ordered that Rivera would continue to have biweekly visitation, but she was to give DHS twenty-four hours' notice and allow DHS into her home for an assessment.
DHS filed a petition for termination of parental rights on October 4, 2017, alleging five grounds under Arkansas Code Annotated section 9-27-341 (Supp. 2017), four of which applied to Rivera:
1. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) That a juvenile has been adjudicated by the Court to be [DN] and has continued to be out of the custody of the mother for twelve (12) months and, despite a meaningful effort by [DHS] to rehabilitate the mother and correct the conditions that caused removal, those conditions have not been remedied by the mother.
*879 2. Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(a) The juvenile has lived outside the home of the parents for a period of twelve (12) months, and the parents have willfully failed to provide significant material support in accordance with their means or to maintain meaningful contact with the juvenile.
3. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) That other factors or issues arose subsequent to the filing of the original petition for [DN] that demonstrate that placement of the juvenile in the custody of the mother is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the mother has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the mother's circumstances that prevent the placement of the juvenile in the custody of the mother.
4. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a) The parent is found by a Court of competent jurisdiction, including the juvenile division of circuit court, to: (3)(A) Have subjected any juvenile to aggravated circumstances. (B) "Aggravated circumstances" means: (i) ... there is little likelihood that services to the family will result in successful reunification." The Court should find that there is little likelihood that services to the mother will result in a successful reunification with her.
A hearing on the termination petition was held January 3, 2018. Candice Eskridge, a DHS caseworker, recommended termination because Rivera had not maintained stable housing or employment, had tested positive for illegal drugs after she had completed inpatient treatment, and had visited sporadically throughout the case. She said Rivera had lived with the child's father, then her own father, and that she then moved across state lines to Memphis. Eskridge said that she could not cross state lines to verify the appropriateness of Rivera's home, but she acknowledged that she also never saw the other two homes in which Rivera had lived and had not verified whether Rivera was working. Eskridge said Rivera had submitted to a drug assessment in August 2016 that recommended she attend inpatient treatment, which Rivera did; but Rivera was discharged prematurely because she did not follow the rules of the program. Subsequently, Rivera entered Quapaw House, and she completed residential services in November 2016. However, Rivera tested positive for methamphetamine, amphetamines, cocaine, and benzodiazepines in April 2017. DHS had obtained other drug screens but none were random because Rivera made herself available only during scheduled visits. Eskridge said Rivera's visits were inconsistent and that Rivera had not seen her son in two months. Eskridge believed G.H. was adoptable and that he would be subject to potential harm if returned to Rivera's custody because she had not shown stability in her housing, employment, or transportation, and she continued to use illegal substances.
On cross-examination, Eskridge acknowledged that (1) Rivera had hired an attorney and corrected her criminal charges by getting them nolle prossed; (2) Rivera had always maintained a home even if she was living with someone else; (3) Eskridge did not see any of those homes; (4) DHS's transportation assistant changed counties and could not always fulfill Rivera's requests to see her child; and (5) there had never been any documented instances in which DHS called Rivera to come in for a drug screen that she had refused. Upon questioning by the ad litem, Eskridge said that Rivera had not seen her son during the case much, even when *880 the assistant was available to transport her-Rivera visited eleven times in 2016 and ten times in 2017 even though she was entitled to see G.H. biweekly.
Amanda Baker, a DHS supervisor, testified that Rivera had given her at least four addresses during the case, and DHS considered that unstable housing. She said that at one point, Rivera was living in an apartment that was missing an appliance and had no furnishings for G.H. She did not believe that Rivera had maintained stable employment because she was aware of multiple employers, including a gas station, a Waffle House, and a Mexican restaurant, but DHS had no proof of Rivera's employment in the file. She testified that Rivera was entitled to visit once every two weeks for two hours because Rivera and G.H. were placed so far apart. She said that Rivera had canceled several visits for reasons such as someone breaking into her home, work conflicts, or being hospitalized. On at least two occasions the transporter drove to Rivera's home, and Rivera did not answer the door.
Rivera testified that the day G.H. was removed by DHS, she and the child's father had been drinking and made a poor decision to leave G.H. with her mother. She acknowledged her arrest on the evening G.H. was removed and that she was jailed for six weeks. She said that she had never been referred for counseling but that she was referred for rehab, and after failing to complete twenty-one days at the first facility, she completed the twenty-one-day program at Quapaw House in Hot Springs. She said she did not see her son while she was in rehab, despite asking many times. She did not know where he was placed, and she did not see him until DHS brought him to her in Jonesboro after Thanksgiving. She said she realized that the child's father did not want to comply with court orders or have anything to do with G.H., so she separated from him and moved out.
Rivera said that she had moved to West Memphis where she had her own place with all working utilities and appliances, and nobody from DHS visited. She then moved to Marion and lived in a trailer that had no stove. She said she had been working during the times she lived in those places and was able to pay rent but that she stayed at each location only two months. She said she had no driver's license and no vehicle; however, a car accident in August 2017 resulted in a broken leg, requiring three weeks' hospitalization. This caused her to lose her full-time employment at Shoney's, where she had been working with her stepmother. She also had not been offered visitation while hospitalized despite having informed DHS of her location. She said she texted the assistant, who had relocated to another county, and she then began calling the DHS office but could rarely get someone to return her calls. She said Amanda Baker returned one call and told her she was trying to get people to help her, but that help never came. She said that she had been living in the same place in Memphis for three months with a boyfriend on whom she depended.
Rivera's stepmother, Kimberly Arreola, testified that she and Rivera's father strongly supported Rivera. She said she had worked at Shoney's for seventeen years, that she was a shift leader, and that she had helped Rivera obtain a job there. She said Rivera lost that job because of her car accident and that Rivera was still recovering. She said that she and Rivera's dad would take care of Rivera and G.H.
II. Order Terminating Parental Rights
The circuit court terminated Rivera's parental rights by order filed January 3, 2018, relying on three of the alleged *881 grounds. The court relied on the failure-to-remedy ground as follows:
The juvenile has been out of the custody of the mother since June 24, 2016, and the Court adjudicated the juvenile [DN] on July 20, 2016, based on neglect and parental unfitness. Since that time, [DHS] has made meaningful efforts to rehabilitate the mother and correct the conditions that caused removal by offering services such as referrals for drug/alcohol assessment, referral for drug treatment, visitation, transportation, random drug screens, and case management. Despite these meaningful efforts, the mother has not remedied the conditions that caused removal in that she tested positive for METH and AMP (confirmed by the lab) in April of 2017, failed to maintain stable housing, failed to maintain stable employment, failed to maintain stable transportation, and failed to maintain regular visits with the juvenile. Thus, the mother has failed to remedy the conditions that caused removal.
The circuit court also found "some inconsistent visits since Nov. 2017 are fault of [DHS] and finds the mother moved to Memphis TN subsequent to the PPH hearing, which complicated things in this case."
The circuit court also relied on the subsequent-factors ground as follows:
Subsequent to the filing of the original petition on June 28, 2016, the mother tested positive on her hair follicle test for AMP, METH, and BENZOs on April 5, 2017. The mother took a drug screen on March 29, 2017, which was positive for METH and AMP. The juvenile came into care on June 24, 2016, which means that the mother was still taking illegal drugs almost a year into the case despite completing an inpatient drug treatment program prior to those failed drug tests. Additionally, the mother continues to miss at least 50% of her visits since the juvenile came into care, has failed to obtain stable housing, failed to obtain stable employment, and failed to obtain stable transportation. [DHS] has offered services such as a drug/alcohol assessment, drug screening, hair follicle test, parenting, visitation, and case management. Nevertheless, the mother has manifested the incapacity or indifference to remedy these subsequent issues.
The circuit court further noted, "Additionally, the mother voluntarily moved out of state where [DHS] cannot offer services."
The circuit court's basis for relying on the aggravated-circumstances ground was also that
[t]he mother has failed to consistently visit with the juvenile despite [DHS] offering her transportation throughout the case. The mother tested positive for METH, AMP, and BENZOs on her hair follicle test in April of this year despite [DHS] offering her drug treatment and drug screening. The mother has also failed to obtain stable housing, transportation, and employment despite the numerous services offered through [DHS] and case management. Thus, there is little likelihood [DHS] could offer any further services to result in a successful reunification.
The circuit court found that G.H. was adoptable and that he would be at risk of potential harm if returned based on lack of contact by the parents and their failure to maintain stable housing, transportation, and employment. This appeal timely followed.
III. Standard of Review
A circuit court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined *882 as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. Bryant v. Ark. Dep't of Human Servs. , 2018 Ark. App. 375, 554 S.W.3d 295. On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. Id.
In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. E.g. , Bryant , supra.
IV. Subsequent Factors and Potential Harm
The circuit court granted the termination petition based on three grounds: (1) failure to remedy, Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)(b) ; (2) subsequent factors, section 9-27-341(b)(3)(B)(vii)(a) ; and (3) aggravated circumstances, section 9-27-341(b)(3)(B)(ix)(a) . Rivera argues that the circuit court's reliance on the failure-to-remedy ground was in error because the court relied on factors that arose subsequent to G.H.'s removal to find that she had failed to remedy the issues causing removal. Because only one ground is necessary to support termination, and because Rivera charges that the circuit court relied on factors occurring after the termination petition was filed to support the failure-to-remedy ground, we need only address her subsequent-factors argument.
Rivera contends that the circuit court relied on the following facts in support of the subsequent-factors ground: (1) a positive urine screen on March 29, 2017, for methamphetamine and amphetamine, which was confirmed for the same drugs by a hair-follicle test on April 5, 2017; (2) sporadic visitation; (3) unstable housing, transportation, and employment; and (4) her move to Memphis, Tennessee.
Rivera argues that her positive drug screen was isolated and did not demonstrate that her drug use was contrary to responsible parenting. She contends that her relapse was not sufficiently pervasive as to warrant a finding that termination was in G.H.'s best interest. She relies on Kight v. Arkansas Department of Human Services , 87 Ark. App. 230, 189 S.W.3d 498 (2004), to contend that this court reversed the termination order in circumstances more egregious than her own. In Kight , we held that the circuit court's termination was clearly erroneous, reasoning as follows:
Beginning with A.W., the record shows that he was removed from the home due to Kight's drug use. The order adjudicating him [DN] ordered Kight to enter drug treatment and submit to random drug testing. Kight followed the court's directive and enrolled in the Freedom House. Her drug tests were negative *883 from July 2002 through December 2002, with one positive test in January 2003. Following this test, Kight enrolled in Chance Sobriety. While CASA originally recommended a ninety-day stay, Kight actually completed six months of residential drug counseling. [Ben] Perkins's testimony regarding Kight's improvement is persuasive, particularly his testimony that she has been drug free throughout the entire program, even though she was given unsupervised weekend passes; that she has been given responsibilities in the house, including overseeing drug testing of other patients; and his belief that Kight will be successful once she reenters society.
Likewise, there was testimony that A.W. was stable with his mother and that she was his primary caregiver. In fact, [Laura] Rogers[, DHS caseworker,] stated that A.W. was doing well in Kight's care, although she was abusing drugs. Moreover, when Rogers first became involved in this case, she did not remove A.W. from the home, despite knowing that Kight had tested positive for drugs. Thus, the reason for A.W.'s removal was not that Kight was an unfit parent or unable to care for her child, but that she was abusing drugs, which she has corrected. Rogers stated that although uncooperative at first, once A.W. was removed from the home, Kight became serious about getting A.W. back, was doing well, had housing, and that she [Rogers] was prepared to return A.W. to the home. A.W. would have been in his mother's care but for a one-time relapse in January. Notwithstanding this one-time relapse, Kight has maintained full time employment while at Chance and has been clean and sober for over six months. This is exactly what DHS asked her to do. DHS has not demonstrated by clear and convincing evidence that terminating Kight's parental rights to A.W. was in his best interest.
Kight , 87 Ark. App. at 237-38, 189 S.W.3d at 502.
Here, Rivera contends that Eskridge tried to portray her drug use "as not so singular," testifying that the screens taken were not random because they had been administered during visitation and that because Rivera had moved to Memphis, she was not available for random screening. Rivera argues that she had moved to Memphis only three months before the termination hearing, which gave DHS seven months following her positive drug screen to randomly screen her. Rivera argues that her single drug use, especially in light of her inpatient drug treatment, was not a sufficient basis to support termination under the subsequent-factors ground, and her sobriety demonstrated that she was not indifferent to or incapable of remedying that issue, negating the court's finding that further services were unlikely to result in reunification. Rivera maintains that her single use of illegal drugs did not demonstrate potential harm because it was an isolated event and she had maintained her sobriety since that time.
Rivera disputes the circuit court's finding that she missed at least 50 percent of her visits since G.H. came into care. Rivera contends that the circuit court's order of October 25, 2016, contains a finding that she had regularly visited G.H. She also points to the circuit court's order that DHS establish visitation around her work schedule, which she contends indicates that her missed visits were beyond her control. She also points to the circuit court's acknowledgment that the inconsistent visits since November 2017 were the fault of DHS. She claims that if DHS was complicit in her missing visitation "at all," then it cannot be said that DHS offered her transportation in such a meaningful way as to satisfy the element of the subsequent-factors *884 ground. She argues that had DHS provided transportation as it was ordered, she may not have been subjected to termination of her parental rights.
Rivera admits that she moved several times, relied on others for transportation, and held several jobs until she was injured in a car accident. However, she contends that she had stable housing for three months before the hearing; her father and stepmother were her support system; and she had a full-time job she could return to at Shoney's after she recovered. She relies on Strickland v. Arkansas Department of Human Services , 103 Ark. App. 193, 199-200, 287 S.W.3d 633, 638-39 (2008), where this court held that, although the children were adjudicated DN and Strickland moved numerous times when the court required that she maintain a stable residence, by the time of the termination hearing, Strickland had acquired her own apartment and had been there for three months. This court held that the reunification plan did not require Strickland to stay in a fixed location, that there was no evidence that her residences were unsafe, and that she faithfully visited her children, completed parenting classes, and obtained stable transportation. Id. Although she had a meager income, there was no evidence that this rendered Strickland unfit. Id. Likewise, Rivera argues that DHS did not present sufficient evidence to demonstrate that she was unfit or that G.H. would be subjected to potential harm if returned to her custody.
Kight , supra , is distinguishable because it addresses the failure-to-remedy ground, not the subsequent-factors ground. Further, unlike Kight , Rivera's noncompliance with the case plan demonstrated her general unfitness, and more than nineteen months had transpired in this case. By contrast, in Kight , drug use was the only basis for parental unfitness; Kight had a single isolated incident of drug use and had completed a second round of inpatient treatment, and only seven months had lapsed since the case began. Strickland , supra , is likewise distinguishable because Rivera had no income, no regular visitation with G.H. throughout the case, and no stable and adequate housing.
Rivera contends that several cases bolster her argument that the circuit court's "best interest" finding was not supported by the evidence. She cites cases in which this court reversed termination orders when the parent had a few slight lapses in judgment, such as consuming alcohol against court orders and fraternizing with friends who were drinking, as well as moving in with a partner the parent had known for only two months. See Rhine v.Ark. Dep't of Human Servs. , 2011 Ark. App., 649, 386 S.W.3d 577 ; Cranford v. Ark. Dep't of Human Servs. , 2011 Ark. App. 211, 378 S.W.3d 851. Rivera argues that there was no basis for the circuit court to find a real risk of harm to G.H. if he had continued contact with her. See Bearden v. Ark. Dep't of Human Servs. , 344 Ark. 317, 42 S.W.3d 397 (2001). Rivera argues that she showed sufficient stability to avoid termination of her parental rights.
Rivera's arguments do not warrant reversal, and clear and convincing evidence supports the circuit court's statutory grounds and best-interest findings. Failure to comply with court orders is a subsequent factor on which termination may be based. Clements v. Ark. Dep't of Human Servs. , 2013 Ark. App. 493, 2013 WL 5273040. This case spanned nineteen months and six hearings. Beginning June 29, 2016, Rivera was ordered to accomplish minimal goals to provide a suitable home for G.H. At the end of nineteen months, Rivera had failed to remedy the subsequent factors despite appropriate services having been offered. The circuit court made repeated findings that DHS had *885 made reasonable efforts to provide family services to Rivera. None of these findings were appealed, and Rivera is barred from challenging those prior findings. Martin v. Ark. Dep't of Human Servs. , 2017 Ark. 115, 515 S.W.3d 599. Further, because only one statutory ground need be proved, Rivera's arguments related to the aggravated-circumstances finding are not addressed. See Bryant , supra.
Clear and convincing evidence supports the circuit court's best-interest finding. The same evidence that supports the subsequent-factors ground also supports the potential-harm prong of the circuit court's best-interest finding. Miller v. Ark. Dep't of Human Servs. , 2017 Ark. App. 396, 525 S.W.3d 48. Failure to provide stable housing and to comply with the court's orders demonstrates potential harm to the child. See Bell v. Ark. Dep't of Human Servs. , 2016 Ark. App. 446, 503 S.W.3d 112 ; Howell , supra .
Affirmed.
Klappenbach and Brown, JJ., agree.

The petition named Veronica Rivera, mother, and Tommy Henton, putative father, as defendants. Even though parental rights were terminated as to both parents, Rivera is the subject of this appeal.

DHS was ordered to do more regarding Rivera's transportation for visitation, but the writing on the order is illegible.