Cite as 2023 Ark. App. 491

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-23-138

| | |
|---|---|
| EMILY COPP AND JOSHUA HARTMAN | Opinion Delivered November 1, 2023 |
| APPELLANTS | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04JV-21-131] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE THOMAS SMITH, JUDGE |
| APPELLEES | AFFIRMED; MOTION TO WITHDRAW GRANTED |

**ROBERT J. GLADWIN, Judge**

In this combined appeal of a termination-of-parental-rights (TPR) order by the Benton County Circuit Court, appellant Joshua Hartman argues that appellee Arkansas Department of Human Services (DHS) failed to present sufficient evidence to support the circuit court's findings with respect to both the statutory-grounds and best-interest elements.

Counsel for appellant Emily Copp filed a separate no-merit brief and motion to withdraw pursuant to *Linker-Flores v. Arkansas Department of Human Services*, 359 Ark. 131, 194 S.W.3d 739 (2004) and Arkansas Supreme Court Rule 6-9(j) (2023). The clerk of this court delivered to Emily a copy of counsel's brief and motion to withdraw and advised her

of her right to file pro se points for reversal; however, no pro se points were filed. We affirm the TPR for both parties and grant Emily's counsel's motion to withdraw.

I. *Facts and Procedural History*

Emily gave birth to MC1 on February 13, 2021. On March 1, 2021, DHS exercised emergency custody of MC1 due to Emily's intellectual disability that rendered her unable to care for him. Specifically, MC1 was born prematurely, and while in the hospital, the nurses became concerned with Emily's ability to parent MC1. For example, Emily told MC1 to "shut up" when he cried; refused to change MC1's diapers or wake up and feed him at night; and failed to attend infant-care classes that the hospital staff deemed necessary. Additionally, Emily has two other children who previously had been in foster care for similar reasons; however, DHS refrained from taking them into foster care due to their existing placement with their father, Thomas Copp.

On March 4, DHS filed a petition for emergency custody of MC1 and a "less-than-custody" petition for MC1's two siblings. The petition alleged that all three juveniles were dependent-neglected, and DHS requested emergency custody of MC1 and that MC1's siblings remain in the custody of their father. Emily denied any issues caring for MC1 and claimed she and MC1's father, Joshua, had everything needed to meet MC1's needs. The same day, the circuit court entered an emergency order granting DHS's petition. In the order, the circuit court appointed an attorney ad litem to represent the children and an attorney to represent Emily. An amended petition was filed on March 5.

2

On March 9, the circuit court held a probable-cause hearing wherein it found that probable cause existed for the emergency order to remain in place. It ordered Joshua to submit to DNA testing to determine whether he is MC1's father. DHS was ordered to contact Emily's former counselor about restarting services and facilitating four hours of supervised visitation a week.

On April 6, the circuit court held an adjudication and disposition hearing wherein it found the allegations in the petition true and adjudicated the juveniles dependent-neglected due to Emily's parental unfitness. The circuit court also found Joshua to be MC's father. A case goal of reunification was set, and the hearing was recessed regarding Joshua's involvement. MC1 was to remain in the custody of DHS, and the two siblings would remain in the custody of their father. Supervised visitation was to be arranged by DHS. Emily was ordered to complete the requirements set out in the case plan. The adjudication as to Joshua was continued to July 6.

After a continuance, on August 3, the circuit court concluded the adjudication hearing and held a review hearing. At this hearing, the circuit court found that Joshua was a nonoffending parent but also that he was unfit to take custody of MC1. The circuit court found that Emily and Joshua were in partial compliance with the case plan and continued the goal of reunification. It found that DHS had made reasonable efforts, and it placed MC1's siblings in the permanent custody of their father and closed their portion of the case. Visitation was kept as previously ordered.

On November 2, the circuit court held a second review hearing. It continued the goal of reunification and found that DHS had made reasonable efforts. The circuit court again determined that Emily and Joshua were in partial compliance with the case plan. Additionally, it ordered Joshua to adjust his work schedule so that he could be home with Emily to assist with caring for MC1. Visitation remained supervised by DHS.

On February 1, 2022, the circuit court held the first permanency-planning hearing. Emily and Joshua were found to be in substantial compliance with the case plan and, as a result, the goal of reunification was continued but with a concurrent goal of adoption. The circuit court found that DHS had made reasonable efforts, and it ordered Emily and Joshua to develop a support system so that they could continue to care for MC1 after the case closed. The circuit court authorized unsupervised visitation to be arranged by DHS. Emily and Joshua were ordered to develop a support system that would assist them in caring for MC1 after the case closed.

On May 10, the circuit court held a second permanency-planning hearing. The circuit court made a reasonable-efforts finding for DHS, found Emily and Joshua to be in full compliance with the case plan, and continued the goal of reunification with no concurrent goal listed. It ordered Emily and Joshua to complete the case plan. Visitation was to be supervised unless otherwise authorized by the circuit court.

On June 3, the first unsupervised weekend visit between MC1, Emily, and Joshua occurred. DHS created a safety plan for the visit wherein the parents agreed that Joshua would supervise all interaction between Emily and MC1 and that Emily would not be left

4

alone with MC1. However, at the conclusion of the unsupervised weekend visit, DHS learned that Joshua had violated the safety plan by leaving MC1 alone with Emily. MC1 was returned to foster care with a large hand-shaped bruise on his thigh. The Crimes Against Children Division of the Arkansas State Police investigated the incident, which resulted in a finding of "true" for abuse by Emily.

A third permanency-planning hearing was held on August 30, with an order entered the same day. MC1 remained in the custody of DHS, and the goal of the case changed to adoption. The circuit court found that services had been offered for eighteen months, and while the parents had worked those services, they had not "demonstrated that they are fit for placement of [MC1]." Emily and Joshua were found to be in partial compliance with the case plan and court orders, and visitation remained supervised by DHS. The circuit court found that DHS had made reasonable efforts and ordered the parents to follow the case plan.

DHS filed a TPR petition on October 7, pleading the following grounds: twelve months out of custody with failure to remedy, *see* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*) (Supp. 2023); subsequent factors, *see* Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*); and aggravated circumstances, specifically little likelihood that continued services would result in reunification, *see* Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(*a*)(3)(B)(i).

The TPR hearing began on November 29. The only witness was Haley Boles, a mental-health professional who provided the family with child-parent psychotherapy. Sessions with Emily and MC1 started in August 2021. The initial goal was for Emily to improve her ability to be attuned to MC1's emotional needs and read his emotional "cues." Emily made mixed

progress regarding her interactions with MC1 because her "disability" made it difficult for her to "accurately" read MC1's cues and respond to those cues in a way that was appropriate for his age and developmental level. Emily made progress in "emotionally" regulating herself and using coping skills to calm herself down so she could be present for MC1. Boles indicated the parents were initially consistent, and when they had missed appointments, they communicated with her; however, when Joshua lost his job in June 2022, there was an increase in missed appointments.

Emily and MC1 completed twenty-four sessions; after which there were four sessions with Emily, Joshua, and MC1 all present. The main goal was to improve the attachment bond between MC1 and his parents. Boles testified that Joshua and MC1 had very positive interactions and made progress very quickly. He had been able to be playful with MC1 and respond to him in developmentally appropriate ways. When MC1 needed to be redirected, Joshua stepped in quickly to make sure MC1 was safe and redirected him appropriately. Joshua always brought a diaper bag, food, and other items that MC1 needed during those sessions.

Boles indicated that she was working with Joshua to be able to redirect Emily in parenting MC1, and Emily had demonstrated the ability to accept feedback from Joshua. Boles explained that it would be beneficial for Emily to try and understand MC1's developmental needs and for Joshua to be present for those sessions. Boles concluded that Joshua had done really well and had met all of the treatment goals.

Boles expressed no concern regarding the parents' ability to work together and explained that the normal protocol would be between twenty-one and twenty-six sessions. But despite Emily's willingness to work in the sessions, Boles opined that Emily would always require another caregiver present when she was with MC1. She stated that Joshua understands that Emily is not in a position to be able to care for MC1 independently.

The TPR hearing resumed on December 6. The first witness was Elexxus Myers, the DHS program assistant involved with the case since it opened. She supervised visitation and transported MC1 to appointments. Visitation had been twice a week for two hours a visit. Myers stated MC1 had "taken up very well to Emily," but Emily struggled picking up on MC1's cues as to what he needed. She explained that as the visits went on, Joshua was able to engage more and recognize MC1's needs. Myers testified that Emily and Joshua got along well during the visits and that Joshua helped Emily if she became overwhelmed. Myers provided hands-on parenting instructions to Emily and Joshua, and she stated that they followed those instructions on subsequent visits but sometimes needed additional guidance. She likewise did not believe Emily could independently parent MC1, and as a result, she instructed Joshua not to leave MC1 alone with Emily.

Myers indicated that Joshua understood Emily would not be able to be left alone with MC1. She stated that he communicated with her when he would need to go to work to make sure that someone was there with Emily.

She stated that Joshua actively participated in and generally parented MC1 appropriately. However, during the October 31, 2022 visit, Joshua lay in bed with covers

7

over his head for the duration of the visit. Myers explained that he would not engage during the visit, even with prompting from Emily and MC1. At the end of the visit, Joshua pushed Emily out the door and locked it. Myers also recounted that a few months earlier, Joshua was dropping off Emily for a session, and they were arguing. Myers heard him use obscene language with Emily, but she noted that there were no problems during the next visit—Joshua was back to normal and supportive of Emily.

Myers indicated that although Emily could become frustrated, she consistently asked for help. Myers admitted that she observed other parents who became frustrated during visitation and praised Emily for asking either Joshua or her if she needed anything or required assistance with MC1 during visitation. Myers acknowledged that if MC1 lived with his parents, there would be times Joshua would be temporarily absent.

Myers stated that Emily and Joshua progressed after the parenting classes and that if Joshua had MC1 by himself, he could take care of him appropriately, safely, and independently. Myers demonstrated how MC1's bruising indicated the markings of fingers and noted that Joshua said nothing when Myers had discussed MC1's injury with Emily. Myers concluded that she did not believe leaving MC1 with both parents would be safe.

Mykaelia Williams, the DHS foster-care caseworker since the previous September, also testified. She detailed a prior case from 2017 that involved Emily and noted the services provided in that case were similar to those provided in this case. Williams did not believe Emily could independently care for MC1. She noted that most of Emily's parenting classes had been online and confirmed that DHS did not provide Emily with a parenting coach.

Williams also stated she did not believe the hotel room in which Emily and Joshua were living was appropriate housing for MC1, although she did acknowledge that it had been deemed appropriate for unsupervised visits. Willims explained that DHS referred the parents to HARK and HUD, but they had not been able to secure appropriate housing during the case. She also noted they were unable to transport MC1 on their own.

Williams also did not know who first saw the bruise on MC1's leg when he was returned to day care after the last unsupervised visit. She confirmed there had been a plan in place for Emily not to be left alone with MC1 and that after the resulting investigation, a true finding against Emily was entered. Williams stated that Joshua had not adhered to the safety plan because Emily was left alone with MC1. During the investigation, Joshua admitted he left Emily alone with MC1 when he needed to go outside or run to the store.

Williams noted that DHS had offered Joshua parenting and counseling services. She stated DHS feels that Joshua needs to complete anger-management classes because there had been issues with domestic violence between the couple at the beginning of the case. The only recent anger-management issue Joshua had demonstrated was at the October 31 visit when he pushed Emily out of the hotel-room door. Williams acknowledged that Joshua has stable employment and has completed a psychological evaluation.

Williams testified that if Joshua and Emily continue together as a couple, DHS does not feel Joshua would be able to safely parent MC1 because of the likelihood of harm that would result if MC1 were to be left alone with Emily. Williams testified that Emily continues to struggle to meet MC1's needs and becomes frustrated by a lack of awareness of his needs

and her inability to help him. Further, Williams noted DHS had not located any other individuals or relatives who could assist Emily if MC1 was returned to her. Finally, Williams confirmed that she believes MC1 is adoptable, and his current foster placement wished to adopt him if Emily's and Joshua's parental rights were terminated.

Emily testified and confirmed there had been only one unsupervised weekend visit with MC1. She and Joshua had picked up MC1 from day care and, afterwards, she noticed the bruise on his leg when she changed his diaper. She explained that she tried to contact DHS but was unable to reach anyone. She denied that Joshua left her alone with MC1 at any time that weekend. She said she knows how to change MC1's diapers and is able to take care of herself when Joshua is at work.

Emily stated she receives $825 a month, which does not fully cover the cost for the hotel room and the car payments. She explained that she lost her "food stamps" and goes to food pantries so she does not have to pay for food. She stated that Joshua assists her in handling money. Emily acknowledged that she had received one-on-one parenting classes after her oldest child was born. She admitted that after the case opened, there was an argument during which she "beat" Joshua and "tore up the car," which led to her arrest and a night in jail. She noted that she attended anger-management classes after she was arrested for the physical altercation with Joshua and learned not to beat up Joshua anymore. She conceded that she and Joshua had never attended couples counseling but testified that she believed she and Joshua could care for MC1, and she described the motel room where they lived.

10

Emily explained that during the October visit when Joshua refused to participate in the visit with MC1, Joshua had told her he was really tired and did not feel good that day. Emily described how at the end of the visit, she was trying to find the dog and accidentally closed the door to the hotel room. Emily said she had to get another key to get in but claimed there had been no pushing, hitting, or yelling.

Joshua testified that he and Emily are engaged. He explained that they live in the Town and Country Inn in Rogers. Joshua confirmed that he is employed at Central States Manufacturing in Tontitown and has been consistently employed except for one week. He works a full time job, from 2:00 p.m. to 10:00 p.m., but he stated that if MC1 comes home with them, he could work from 12:30 to 8:30 and leave in the middle of his shift to pick up MC1 and Emily and drive them back to his place of employment. He pointed out that Emily and MC1 would be in a safe spot where MC1 can play. Joshua detailed that it takes him only twenty minutes at a time to complete his tasks at work, and he pointed out that his boss approves of this plan.

Joshua asserted that he does not believe Emily would hurt MC1 if she was alone with him, but he did acknowledge she should not be left alone with MC1 because of her intellectual disabilities. He noted that Emily has a hard time remembering dates and times as well as feeding MC1 or putting him to bed.

He testified that he did not know how MC1 got the previously described bruise and that MC1 did not need medical treatment as a result. Joshua testified that he never left Emily alone with MC1 over the weekend that the bruise occurred.

Joshua testified that he could take care of MC1 if he had him by himself. He explained that he would have a day care or babysitter or that he would switch his work schedule around to care for MC1. He explained that he could do the same thing if he and Emily had MC1. He noted he has some anger issues that run in his family and stated he had addressed them at Ozark Guidance with a therapist, which seemed to help.

Joshua explained that during the October 31, 2002 visit, he had a bad headache and was sick to his stomach. He claimed he did not want to get MC1 sick and that the onset was sudden. Joshua testified that he did not push Emily out of the door; rather, she accidentally locked herself out.

After closing, the circuit court ruled that it was granting DHS's TPR petition, and an order was entered on December 15. Emily and Joshua each filed a timely notice of appeal on January 5, 2023, and Emily filed an amended notice of appeal on January 13.

## II. *Joshua Hartman's Merit Brief*

In his merit brief, Joshua argues that DHS did not prove by clear and convincing evidence any of the statutory grounds for TPR pursuant to the Arkansas Juvenile Code or that TPR is in MC1's best interest.

## A. Standard of Review and Applicable Law

TPR cases are reviewed de novo. *E.g.*, *Perry v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 193, at 7, 625 S.W.3d 374, 379. Additionally, appellate courts will not reverse a termination order unless the findings were clearly erroneous, meaning "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm

conviction that a mistake has been made." *Id.* Further, credibility determinations are within the circuit court's discretion, and appellate courts will not question those determinations on appeal. *Id.*

To terminate parental rights, a circuit court must find by clear and convincing evidence at least one termination ground, and it must also find that termination is in the juvenile's best interest by considering the likelihood of adoption and the potential harm that would result if the juvenile were returned to the parent. *Id.* at 6–7, 625 S.W.3d at 379. Further, "[c]lear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established." *Rivera v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 405, at 9, 558 S.W.3d 876, 881–82.

## B. Statutory-Grounds Analysis

DHS alleged three grounds against Joshua in support of TPR: twelve months out of custody with failure to remedy, *see* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*; subsequent factors, *see* Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*; and aggravated circumstances, specifically little likelihood that continued services would result in reunification, pursuant to Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A), (B)(i)*. DHS need only prove one statutory ground to support TPR, *see Burks v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 94, at 5, 660 S.W.3d 918, 922.

DHS alleged the aggravated-circumstances ground pursuant to Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A), (B)(i)*, which requires that DHS prove that

13

[t]he parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to: . . .

(3)(A) Have subjected any juvenile to aggravated circumstances.

(B) "Aggravated circumstances" means:

(i) . . . a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification.

A caseworker's testimony that there are no further services that DHS can provide to reunify a parent with his or her child supports a finding of aggravated circumstances in a TPR proceeding. *Myers v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 46, 660 S.W.3d 357.

Joshua claims he was fit for placement of MC1, and there were additional services that were ongoing for Joshua that could result in a successful reunification. Specifically, Joshua asserts the testimony was uncontroverted that he could parent MC1 if Emily was not in the picture. He submits he has a plan to safely parent MC1 with Emily in the household.

We hold that the circuit court did not clearly err in terminating Joshua's parental rights on the aggravated-circumstances ground. For almost two years, DHS worked with Joshua and Emily on parenting skills during visitation and offered multiple services, such as parenting classes, counseling, visitation, transportation, hands-on parenting training, housing assistance, couples counseling, and anger-management classes. Additionally, DHS allowed Joshua and Emily an unsupervised weekend visit with a safety plan that required Joshua to supervise all contact between MC1 and Emily. However, despite the services, Joshua left MC1 alone with Emily during the unsupervised visit, and during this unsupervised contact, Emily abused MC1. Additionally, Joshua failed to comply with anger-

14

management classes, and he and Emily continued to remain in an abusive relationship with each other. *See Best v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 485, at 20–22, 611 S.W.3d 690, 702–03 Further, although all the evidence demonstrated that Emily could never independently parent or be alone with MC1, Joshua refused to accept this and maintained that it would be safe to leave MC1 alone with her if he returned to their custody. *See Salinas v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 272, at 10–12, 599 S.W.3d 728, 735–36.

Joshua's argument merely asks this court to reweigh the evidence on appeal, which is not our role. *E.g., Bentley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 374, at 13, 554 S.W.3d 285, 293. Even if Joshua could independently parent MC1, he admitted that there would undoubtedly be instances in which he would need to leave MC1 alone with Emily because he had no other support system, and he felt there was no issue with this, despite the evidence to the contrary.

Finally, Joshua argues that services must be exhausted before a circuit court can terminate parental rights on this ground. This is an incorrect statement of the law. *E.g., Jackson v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 440, at 10, 503 S.W.3d 122, 128. There is no temporal requirement under the aggravated-circumstances ground, and this ground does not require evidence of services. *E.g., Burks v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 309, at 14, 634 S.W.3d 527, 535; *Kohlman v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 164, at 9, 544 S.W.3d 595, 600.

Because only one statutory ground need be proved, we do not address the other two grounds relied on by the circuit court. *Draper, supra.*

## C. Best-Interest Analysis

As to the potential-harm element of the best-interest analysis, the Juvenile Code requires the circuit court to find that the child would be subject to potential harm caused by "returning the child to the custody of the parent." Ark. Code Ann. § 9-27-341(b)(3)(A)(i)– (ii). Potential harm must be viewed in a forward-looking manner and considered in broad terms. *Dowdy v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722. Each TPR case is decided on a case-by-case basis. *Blankenship v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 63, 661 S.W.3d 227. TPR cannot be based on mere speculation. *See Duncan v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 489.

Joshua adopts the previous section of his argument, arguing that the same basis supports a reversal with regard to a finding that TPR is in MC1's best interest. Joshua maintained his housing and employment, and his commitment to services and to MC1 was ongoing. Accordingly, Joshua asks this court to find there was insufficient evidence to support the circuit court's finding that TPR was in MC1's best interest.

We disagree and hold that sufficient evidence supports the circuit court's best-interest finding. The circuit court may determine if it is in a juvenile's best interest to terminate parental rights by considering the juvenile's adoptability and the potential harm caused by returning the juvenile to the parent. *E.g.*, *Norton v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 43, at 5, 481 S.W.3d 780, 783. Neither of these two factors is an essential element of proof in a termination case; thus, neither factor needs to be established by clear and convincing evidence. *E.g.*, *Bentley*, 2018 Ark. App. 374, at 13–14, 554 S.W.3d at 294.

16

Joshua fails to challenge the adoptability factor of the circuit court's best-interest finding; thus, this court is not required to address this issue on appeal.[1] *See, e.g., Easter v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 441, at 8, 587 S.W.3d 604, 608.

He does, however, challenge the potential-harm factor. For potential harm, a circuit court is not required to identify actual harm, and potential harm must be viewed in a forward-looking manner. *E.g., Rivera*, 2018 Ark. App. 405, at 15–16, 558 S.W.3d at 885. Additionally, "[a] parent's past behavior is often a good indicator of future behavior." *E.g., Perry*, 2021 Ark. App. 193, at 10, 625 S.W.3d at 381. Further, evidence of domestic violence between the parents may demonstrate potential harm. *See Wilson v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 666, at 13, 476 S.W.3d 816, 824. Here, there was sufficient evidence of potential harm because Joshua failed to resolve his domestic-violence issues with Emily, and even after she was determined to have abused MC1, Joshua stated it would be fine for her to supervise MC1 alone. For the same reasons stated above, we reject this argument. *See Bentley*, 2018 Ark. App. 374, at 13, 554 S.W.3d at 293.

III. *Emily Copp's No-Merit Appeal*

---

[1]We do note that Mykaelia Williams, the DHS foster-care caseworker, confirmed that she believes MC1 is adoptable, and his current foster placement wished to adopt him if Emily's and Joshua's parental rights were terminated.

Emily appeals the order of the Benton County Circuit Court terminating her parental rights to her child, MC1. Her brief is filed in accordance with *Linker-Flores v. Arkansas Department of Human Servs.*, 359 Ark. 131, 194 S.W.3d 739 (2004), and Arkansas Supreme Court Rule 6-9(j) (2023). Emily's attorney has filed a motion to be relieved as counsel and a no-merit brief asserting that there are no issues of arguable merit to support an appeal. The clerk of our court sent copies of the brief and the motion to withdraw to Emily, informing her of her right to file pro se points for reversal pursuant to Rule 6-9(j)(3), but none were filed. After reviewing counsel's brief and the record, we agree that an appeal would be wholly without merit.

A. Standard of Review and Applicable Law

An order terminating parental rights must be based on a finding by clear and convincing evidence that termination of a parent's rights is in the best interest of the child, considering the likelihood that the child will be adopted if the parent's rights are terminated, and the potential harm caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A). The court must also find one of the grounds outlined in the termination statute. The relevant grounds here are the same as set forth in Joshua's merit-brief analysis.

TPR is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Watts v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 334, at 7, 669 S.W.3d 915, 919. A heavy burden is placed on a party seeking to terminate the parental relationship,

18

and the facts warranting termination must be proved by clear and convincing evidence. *Id.* at 7, 669 S.W.3d at 920; *see also* Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Watts*, 2023 Ark. App. 334, at 8, 669 S.W.3d at 920. When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the circuit court's finding was clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Such cases are reviewed de novo on appeal, but appellate courts give a high degree of deference to the circuit court since it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. Clear and convincing evidence to terminate an appellant's parental rights on at least one statutory ground is all that is required. *Id.*

B. Statutory Grounds Under Ark. Code Ann. § 9-27-341(b)(3)(B)

The strongest ground relied on by the circuit court when terminating Emily's parental rights was Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)*, that a parent has subjected a child to aggravated circumstances—specifically, that the court has made a determination that there is little likelihood that continued services would result in successful reunification. This court has stated that little likelihood "occurs when a parent is not following through with offers of assistance, is not completing basic goals of the case plan, and there is a lack of significant progress on the parent's part." *Aday v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 677, at 4. In

19

addition, a parent's continued inability to protect and care for his or her child and failure to benefit from the services provided demonstrate little likelihood. *Bentley, supra.* Finally, this court has affirmed terminations when there was substantial evidence that demonstrated "continued parental instability" despite working with DHS. *Chapman v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 525, at 5, 443 S.W.3d 564, 567. Termination under this ground has been upheld when the parent, after being provided over a year of services, "had not demonstrated sufficient parenting skills to regain custody of the children or to be trusted with a trial placement or unsupervised visitation." *Jones v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 299, at 7, 578 S.W.3d 312, 317.

We agree with counsel that DHS clearly and convincingly proved this ground for TPR. The aggravated-circumstances finding was supported by the record within this matter. At the time of the TPR hearing, Emily, after several years of services provided by DHS, was unable to demonstrate the ability to care for her son and meet his needs. MC1 came into foster care in March 2021, twenty-one months before the December 2022 TPR hearing. At the time of the TPR hearing, MC2 and MC3 were in the permanent custody of their father, with Emily prohibited from any unsupervised contact.

In the 2017 case involving MC2, Emily was provided with hands-on parenting instruction through Healthy Families, additional parenting classes, counseling services to aid her in making life decisions, clothing assistance, food assistance, and a referral for housing. Many of the same services were offered after MC1 had been placed in foster care in 2021. Here, Emily was provided hands-on parenting instruction during visitation, parenting classes

20

through DHS, counseling, food assistance, clothing assistance, referrals for housing assistance, a psychological evaluation, and child parent psychotherapy. Emily was also provided with a one-on-one mentor through the Arkansas Disability Coalition.

Even though Emily participated in services required by the court and DHS, this court has held time and again that completion of the case plan is not the determinative factor; rather, it is whether completion of the case plan enables a parent to safely care for her child. *Tucker v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1. This court has also upheld TPR findings that the parents lacked "the capacity to adapt to the ever-changing demands and challenges of raising a child" even when it was clear that they loved and were devoted to their child. *Dowdy,*2009 Ark. App. 180, at 14, 314 S.W.3d at 729. Despite evidence that Emily loves MC1, at the time of the TPR hearing, the testimony and evidence clearly showed that she could not care for MC1 and that any interaction would require constant supervision and assistance.

There is no issue of arguable merit that the circuit court erred when concluding that Emily had subjected MC1 to aggravated circumstances because there was little likelihood that further services would result in reunification. Emily was involved with DHS on and off since 2017. In this case, she received services for approximately twenty-one months, but at the time of the TPR hearing she still "had not demonstrated sufficient parenting skills" to show that MC1 could be safely returned to her care. One unsupervised visit occurred, but it required a safety plan prohibiting Emily from being left alone with MC1. After that one visit in which Emily was allegedly left alone with MC1, he returned with what appeared to be a

21

bruise in the shape of a handprint on his leg. That incident resulted in an investigation by the Arkansas State Police that concluded with a true finding for abuse against Emily. For the foregoing reasons, there simply is no meritorious argument that the court erred in finding there was little likelihood that services would result in successful reunification.

C. Best-Interest Analysis under Ark. Code Ann. § 9-27-341(b)(3)(A)

Regarding the circuit court's best-interest finding for a possible challenge, Emily's counsel claims it, too, would be frivolous to seek reversal on this element. The Juvenile Code requires that a best-interest finding be based on a consideration of at least two factors, as noted above: the likelihood of adoptability and the potential harm caused by "returning the child to the custody of the parent . . . ." Ark. Code Ann. § 9-27-341(b)(3)(A). Potential harm must be viewed in a forward-looking manner and considered in broad terms. *Dowdy*, *supra*; *Lee v. Ark. Dep't of Hum. Servs.*, 102 Ark. App. 337, 285 S.W.3d 277 (2008). Each factor does not have to be proved by clear and convincing evidence; rather, it is the overall evidence that must demonstrate clearly and convincingly that termination is in the child's best interest. *McFarland v. Ark. Dep't of Hum. Servs.*, 91 Ark. App. 323, 201 S.W.3d 143 (2005).

In the present case, Mykaelia Williams, the DHS foster-care worker assigned to the case, testified that MC1 has no barriers to adoption and that his foster parents wished to adopt if parental rights were terminated. This court has made clear that a caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding. *See, e.g.*, *Burks*, 2023 Ark. App. 94, 660 S.W.3d 918. As such, DHS presented more than sufficient

22

evidence on the adoptability issue, and there is no meritorious challenge. *Cole v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App, 121, 543 S.W.3d 540.

Regarding potential harm, the circuit court found that MC1 would be at risk of potential harm if parental rights were not terminated. In making this finding, the circuit court specifically stated that "the parents have not demonstrated that they have stability and the parents have not demonstrated an ability to protect the juvenile and keep him safe from harm, for all the reasons listed above." One of those reasons listed in the TPR order was the finding that in both the prior case involving MC2 and the present case, Emily "was offered every service available to her by [DHS] in order to try to make her fit to parent the juvenile" but still "every specialist and professional involved in this case testified that Emily is not capable of raising a child on her own."

DHS had been involved with Emily going back to 2017 in a case involving her oldest child. Here, she was offered similar services, but after twenty-one months, she had not made any significant progress to show it was safe for MC1 to be in her care without constant supervision. Additionally, after the case opened, she admitted she "beat" MC1's father, Joshua, and "tore up the car," which led to her arrest. Six months before the TPR hearing, after the first and only unsupervised visit, MC1 returned with a bruise, and a subsequent investigation led to a true finding against Emily for abuse. All this evidence, when taken as a whole, supports the circuit court's conclusion that MC1 would be at risk of harm if returned to Emily's custody due to her continued instability and inability to keep MC1 safe from harm.

23

D. Adverse Rulings at the Termination Hearing

In accordance with Ark. Sup. Ct. R. 6-9(i)(1)(A), counsel for Emily has reviewed the record for all rulings adverse to her made by the circuit court on all objections, motions, and requests made by the party at the hearing from which the appeal arose.

### 1. *Objection to question by attorney ad litem*

Emily objected to a question by the attorney ad litem concerning whether Emily was found to be the offender after MC1 had come back from the unsupervised visit with a bruise. The circuit court did not make a specific ruling on the objection but did allow the testimony as to the information from the report to the prosecuting attorney, including the assertion that Emily made a partial admission to causing the injury to MC1 and the statement that the investigation resulted in a true finding against Emily. Because the report to the prosecuting attorney containing the information asked about and testified to had already been introduced without objection, we hold there is no basis for a merit appeal on this ruling.

### 2. *Record supplementation*

The second objection occurred when the circuit court stated that the record should be supplemented with the permanency-planning and closure order from the 2017 case involving MC2. DHS introduced the order as an exhibit, and Emily objected because DHS "should have included that." The circuit court noted Emily's objection but allowed the order to be introduced. There had already been testimony as to the information contained in that order—mainly, that DHS provided services to achieve the goal of reunification, and as a

result, the case closed in 2018 with custody returned to Emily and Mr. Copp. This information was also referenced in the case contact notes that went back to the beginning of 2017 case and were entered into evidence without objection. Accordingly, it likewise does not provide a basis for a merit-based appeal.

### 3. *Request to coparent*

Out of an abundance of caution, counsel addresses the argument made at the hearing that "as a team" Emily and Joshua could safely parent MC1 in light of testimony that Joshua had the potential to care for MC1 on his own. By terminating Emily's and Joshua's parental rights, the circuit court declined the request to continue working toward reunification with both parents so they could parent MC1 together. Counsel argues that it was not reversable error for the circuit court to deny this request, and we agree. Despite Joshua's testimony that he would provide constant supervision of Emily and MC1, this arrangement was not even manageable during the pendency of the case. His only solution to follow the requirement for constant supervision was to bring Emily and MC1 to work with him and have them stay in a small room while he worked. Even with this plan, Emily and MC1 would be left alone for up to twenty minutes at a time.

Another factor was the instability in the relationship between Emily and Joshua. Emily admitted that she "beat" Joshua during an argument, which led to her arrest and a no-contact order that she and Joshua violated by living together while it was in effect. DHS program assistant Myers testified about another incident that occurred approximately a month before the TPR hearing—that Emily and Joshua denied—in which Joshua pushed

Emily and locked her out of their hotel room. These incidents that occurred at the beginning and toward the end of the case demonstrate the continued instability in the relationship. While both Emily and Joshua received counseling between these two events, it cannot be said that they sufficiently benefited from this service to demonstrate that they had a stable relationship that would enable them to parent MC1 together within the parameters set by the circuit court and DHS to ensure MC1's safety. Therefore, while there was testimony that Joshua had the ability to parent MC1, the court clearly considered Emily's argument that she and Joshua could parent MC1 together and did not err in refusing to grant her request for further services so that, as a "team," she and Joshua could safely parent MC1.

#### 4. *Treatment of Emily's disabilities*

There is one issue that, while not brought up at the time of the hearing, is addressed by Emily' counsel. There was testimony regarding Emily's "intellectual disability" that affected her ability to safely care for MC1. It could have been argued that Emily was entitled to accommodations through the Americans with Disabilities Act. Even though this was never addressed at the trial level, an argument could be made that it would fall under the third exception to the contemporaneous-objection requirement set forth in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). However, the circuit court and DHS did not ignore Emily's potential disability, and she was provided numerous services over the twenty-one-month period that took into account any disability. DHS provided Emily hands-on parenting instruction to demonstrate what was necessary when feeding MC1 and how to pick up on MC1's cues to know what he needed. Additionally, DHS provided Emily with a full itinerary

breaking down MC1's care throughout the day. DHS referred Emily to child-parent psychology, where she had over twenty-five sessions with MC1, and the Arkansas Disability Coalition provided her with a one-on-one mentor. Outside of what was already offered, Emily did not request any additional special services that would have helped her achieve reunification. Considering this court's previous analysis, a *Wicks* exception is not applicable in this case, and any argument for special accommodations was not preserved for appeal. *Pratt v. Ark. Dept. of Hum. Servs.*, 2012 Ark. App. 399, 413 S.W.3d 261. Finally, the aggravated-circumstances ground does not require DHS to prove that services were offered. *Willis v. Ark. Dept. of Hum. Servs*, 2017 Ark. App. 559, 536 S.W.3d 842.

Despite Emily's love for MC1 and DHS's provision of multiple services to achieve reunification, it was unclear if Emily would ever be capable of safely parenting MC1. As such, no meritorious argument can be made to support a reversal of the circuit court's TPR decision or that the decision was not in the best interest of MC1.

## IV. *Conclusion*

There were no other issues preserved or developed at trial below, and this court will not address issues raised for the first time on appeal; therefore, there were no additional adverse decisions that would provide the basis for a meritorious argument on appeal. *See Lamontagne v. Arkansas Dep't of Human Servs.*, 2010 Ark. 190, 366 S.W.3d 351. Having diligently studied the record, and in her professional judgment, counsel for Emily believes that the record clearly and convincingly supports the decision of the circuit court to

terminate Emily's parental rights. The statutory requirements were met, and the evidence presented at the hearing established that termination was in MC1's best interest.

Accordingly, we hold that the circuit court did not err in terminating Joshua's and Emily's parental rights.

Affirmed; motion to withdraw granted.

VIRDEN and BARRETT, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant Emily Copp.

*Dusti Standridge*, for separate appellant Joshua Hartman.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.